United States Court of Appeals,

Fifth Circuit.

Nos. 95-20349, 95-21019 and 96-20781.

MARTIN'S HEREND IMPORTS, INC. and Herendi Porcelangyar, Plaintiffs-Counter Defendants-Appellees,

v.

DIAMOND & GEM TRADING USA, CO., Judith Juhasz and Frank Juhasz, Defendants-Counter Plaintiffs-Appellants.

MARTIN'S HEREND IMPORTS, INC. and Herendi Porcelangyar, Plaintiffs-Counter Defendants-Appellees,

v.

DIAMOND & GEM TRADING USA, CO., et al., Defendants,

Judith Juhasz and Frank Juhasz, Defendants-Counter Claimants-Appellants.

MARTIN'S HEREND IMPORTS, INC. and Herendi Porcelangyar, Plaintiffs-Appellees,

v.

DIAMOND & GEM TRADING USA, CO., et al., Defendants,

Judith Juhasz and Frank Juhasz, Defendants-Appellants.

May 28, 1997.

Appeals from the United States District Court for the Southern District of Texas.

Before REAVLEY, KING and BARKSDALE, Circuit Judges.

REAVLEY, Circuit Judge:

In this trademark dispute, Judit and Frank Juhasz and their proprietorship, Diamond & Gem Trading, USA, Co. (collectively Juhasz), appeal a judgment awarding injunctive relief and damages, a contempt order, an order awarding attorney's fees, and a summary judgment denying their counterclaim for wrongful seizure. We agree

1

with the district court that plaintiffs were entitled to injunctive relief and damages, but hold that the injunction entered was too broad. We also reverse the award of attorney's fees, affirm the contempt order, and reverse the judgment on the counterclaim.

BACKGROUND

Herendi Pocelangyar (Herendi), a Hungarian corporation, is the manufacturer of Herend porcelain. It manufactures high-quality porcelain tableware, figurines, and other pieces. The pieces are hand-painted by master craftsmen and usually sell for hundreds or thousands of dollars each. Herendi owns a federally registered trademark which consists of the hand-painted "Herend" name and design.

Martin's Herend Imports, Inc. (Martin's) is an American corporation. Martin's and Herendi are parties to an exclusive distributorship agreement, under which Martin's is authorized as the sole importer of Herend porcelain for sale in the United States.[1] Martin's and Herendi select which Herendi pieces are offered for sale in this country. Martin's imports top quality pieces and resells them in this country to upscale retailers. It chooses not to import many of the thousands of items offered by Herendi even when manufactured to the same quality standards.

Juhasz, individually or through Diamond & Gem or a successor company, sold pieces bearing the Herend trademark after purchasing them from American and foreign sources, including Herendi company

---

[1]The United States distributorship is exclusive except as to the U.S. Virgin Islands.

2

stores located in Hungary.  The parties dispute whether Juhasz ever sold Herendi pieces that were "counterfeit" in the ordinary sense, meaning that they bore a fake trademark or were not in fact manufactured by Herendi.  Juhasz has vehemently maintained throughout this litigation that it only sold genuine Herend porcelain, purchased from legitimate sources in this country or elsewhere.  It claims that all the goods it sold bore a true Herendi trademark and were in fact manufactured at the Herendi factory.  Some of the pieces were vintage items from private collections.  Juhasz conceded, however, that it sold Herend pieces not offered for sale in this country by Martin's, the exclusive distributor for the American market.  Such pieces are sometimes referred to as "gray market" goods.[2]

Herendi and Martin's sued Juhasz, alleging trademark infringement and false designation of origin, and seeking injunctive relief, damages and an ex parte order of seizure.  The complaint alleges that Juhasz sells "counterfeit goods" bearing "counterfeit Herendi trademarks."  An accompanying affidavit submitted by Martin's president states that Martin's had purchased from Juhasz numerous counterfeit Herend pieces, which were inferior in quality to genuine pieces.  On the same day that suit was filed, the district court signed a temporary restraining order and order of seizure.  Plaintiffs, through counsel and with the assistance of

_____

[2]*See K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 285, 108 S.Ct. 1811, 1814, 100 L.Ed.2d 313 (1988) ("A gray-market good is a foreign-manufactured good, bearing a valid United States trademark, that is imported without the consent of the United States trademark holder.").

U.S. marshals, raided Juhasz's premises, seizing numerous goods and records.

The case proceeded to trial. At the close of plaintiffs' case, the district court granted plaintiffs' motions for summary judgment and judgment as a matter of law, holding Juhasz liable for trademark infringement, and denying its counterclaim for wrongful seizure. The issue of damages was left to the jury, which returned a verdict of $685,000. The court entered judgment in favor of both plaintiffs for this amount, and granted a permanent injunction against Juhasz. As discussed below, the court later awarded plaintiffs attorney's fees, and entered an order of contempt against Juhasz.

DISCUSSION

A. *Liability for Trademark Infringement*

While originally alleging that Juhasz was selling fake Herend porcelain, plaintiffs ultimately sought judgment on the theory that the pieces sold by Juhasz, even if genuine, were materially different from those imported by Martin's for sale in this country under its rights as the exclusive importer and distributor of Herend wares. The difference is between those lines of Herend products Martin's imports and those lines it does not import. The district court agreed with this theory of liability.

Some courts have recognized that trademark protection extends to bar a defendant's importation of genuine goods where, as here, the manufacturer of the goods has granted exclusive importation rights to a single domestic importer. An early explication of this

4

doctrine is found in Justice Holmes's opinion in *A. Bourjois & Co. v. Katzel.*[3] There, plaintiff Bourjois purchased the United States business and the "Java" trademark of a French face powder manufacturer. Defendant Katzel purchased the same powder in France, packed in French boxes with the "Java" name, and began selling it in the United States. Although the powder was genuine, the Court held that the plaintiff's trademark had been infringed. The Court reasoned that the French manufacturer could no longer legally sell the powder in the United States, and should not be able to circumvent its agreement with the plaintiff by selling the powder to others for import into this country. An essential teaching of *Katzel* is that trademarks can sometimes have a territorial scope.

There are factual distinctions between our case and *Katzel.* In *Katzel,* the American importer was the only plaintiff, while in our case both the American importer (Martin's) and the foreign manufacturer (Herendi) are plaintiffs. The Court noted a "public understanding [ ] that the goods come from the plaintiff although not made by it," that the trademark itself had been sold to the plaintiff, and that the trademark "stakes the reputation of the plaintiff upon the character of the goods."[4] In our case, liability was not based on proof that Martin's owns the trademark, or that the public attached any meaning to the Martin's name or even associated Martin's with Herend porcelain. Nevertheless,

---

[3]260 U.S. 689, 43 S.Ct. 244, 67 L.Ed. 464 (1923).

[4]*Id.* at 692, 43 S.Ct. at 245.

5

other courts have read *Katzel* and the trademark laws to prohibit a defendant from importing goods that are materially different from those imported by an exclusive distributor or importer, even absent proof that the public associates the goods with the exclusive distributor.

This approach was fully explicated in the First Circuit's opinion in *Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.*[5] Nestle, a foreign company, owned the trademark for Perugina chocolates. Nestle sold expensive, Italian-made Perugina chocolates in Puerto Rico through an exclusive distributorship agreement with an American affiliate. It also licensed the manufacture and sale of less expensive Perugina chocolates in Venezuela. Defendant Casa Helvetia purchased the Venezuelan chocolates through a middleman, imported them to Puerto Rico, and sold them there under the Perugina mark. The court recognized that trademark protection has a territorial element, but said that *Katzel* did not prohibit the importation of identical foreign goods carrying a valid trademark since, by and large, "courts do not read *Katzel* ... to disallow the lawful importation of identical foreign goods carrying a valid foreign trademark. Be that as it may, territorial protection kicks in under the Lanham Act where two merchants sell physically different products in the same market and under the same name, for it is this prototype that impinges on a trademark holder's goodwill and threatens to deceive consumers."[6]

---

[5] 982 F.2d 633 (1st Cir.1992).

[6] *Id.* at 637 (citations omitted).

6

The court adopted a test finding infringement where the foreign goods imported by the defendant gray market importer are materially different from the goods sold by the plaintiff authorized to sell the trademarked goods in the domestic market.[7]  The court also noted that in this context "the threshold of materiality is always quite low."[8]  Applying this test, the court held as a matter of law that the chocolates were materially different since their presentation, composition, variety, and price were different.[9]

As in our case, the goods at issue in *Nestle* were authentic and bore a genuine trademark.  The court nevertheless held that Nestle, the owner of the trademark, and its regional Puerto Rico distributor were entitled to injunctive relief for trademark infringement and unfair competition under sections 32(1)(a), 42 and 43(a)(1) of the Lanham Act.[10]  The court reasoned that "the

---

[7]*Id.* at 637-40.

[8]*Id.* at 641.

[9]*Id.* at 642-44.

[10]15 U.S.C. §§ 1114(1)(a), 1124, 1125(a)(1).  Juhasz claims that plaintiffs lack standing to pursue a trademark infringement action.  Herendi has standing as the registrant and owner of the trademark.  Courts have reached different conclusions as to whether an exclusive distributor has standing to sue for trademark infringement. *E.g., Quabaug Rubber Co. v. Fabiano Shoe Co.,* 567 F.2d 154, 158-60 (1st Cir.1977); *DEP Corp. v. Interstate Cigar Co.,* 622 F.2d 621, 622-23 (2d Cir.1980); *Ferrero U.S.A., Inc. v. Ozak Trading, Inc.,* 753 F.Supp. 1240, 1244-45 (D.N.J.), *aff'd mem.,* 935 F.2d 1281 (3d Cir.1991).  Regardless, in this circuit Martin's has standing to sue for unfair competition under 15 U.S.C. § 1125, even if it lacks standing to sue for trademark infringement under 15 U.S.C. § 1114. *Norman M. Morris Corp. v. Weinstein,* 466 F.2d 137, 142 (5th Cir.1972) (holding that exclusive distributor has standing to sue for unfair competition). *Accord Quabaug,* 567 F.2d at 160.

7

importation of goods properly trademarked abroad but not intended for sale locally may confuse consumers and may well threaten the local mark owner's goodwill."[11]

*Nestle* did not turn on proof by the plaintiff of consumer confusion. Instead, it presumed a likelihood of confusion as a matter of law when the products are materially different.[12] It recognized that the presumption can be overcome by proof from the defendant that "the differences are not of the kind that consumers, on average, would likely consider in purchasing the product."[13]

The Second Circuit has taken a similar approach. In *Original Appalachian Artworks, Inc. v. Granada Electronics, Inc. ("OAA")*,[14] the owner of the trademark for Cabbage Patch Kids dolls, OAA, had licensed a Spanish company, Jesmar, to make and sell Cabbage Patch Kids dolls in Spain. The dolls differed from dolls made for the American market in that the "adoption papers" were printed in Spanish. When the defendant, a gray-market importer, began importing the Jesmar dolls, OAA sought injunctive relief under the Lanham Act. The court upheld a permanent injunction under section 32(1)(a) of the Lanham Act,[15] on grounds that "Jesmar's dolls were not intended to be sold in the United States and, most importantly, were materially different from the Coleco Cabbage Patch Kids dolls

_____

[11]*Nestle,* 982 F.2d at 636.

[12]*Id.* at 640.

[13]*Id.* at 641.

[14]816 F.2d 68 (2d Cir.1987).

[15]15 U.S.C. § 1114(1)(a).

sold in the United States.... Thus, even though the goods do bear OAA's trademark and were manufactured under license with OAA, they are not "genuine' goods because they differ from Coleco dolls and were not authorized for sale in the United States."[16]

We are persuaded that the *Nestle/OAA* test, which finds infringement if the goods sold by the authorized domestic distributor and the defendant's foreign goods are materially different, is a sound one, at least when the goods in question are highly artistic, luxury goods. The successful marketing of such goods in this country by a foreign manufacturer is a skill and not a science. It depends not only on the "quality" of such goods as measured in some objective or scientific sense, but on the ability to impart on the domestic consumer a view that the goods are rare, collectable, elegant, chic, or otherwise highly desirable pieces to own. As the Court noted in *Katzel,* "the monopoly of a trade-mark ... deals with a delicate matter that may be of great value but that easily is destroyed...."[17] For Herendi, maintaining the goodwill of its trademark may depend on the stores where the goods are sold, advertising, the selection of which of the thousands of Herendi pieces will be offered for sale in this country, and many other factors. The president of Martin's stated in a summary judgment affidavit that Martin's "limits the Herend products which are sold here based on its evaluation of the U.S. market, its desire to promote product identity among U.S. consumers, its desire

---

[16]*OAA,* 816 F.2d at 73.

[17]*Katzel*, 260 U.S. at 692, 43 S.Ct. at 245.

to control the nature of the products on which the Herend mark is affixed, and the public's perception of the Herend mark. [Martin's] decisions can have a significant impact on the image of Herend products in the U.S." As is its right, Herendi has chosen Martin's as its exclusive distributor to assist in these complex decisions, as a means of preserving the value of its trademark in this country.

The district court properly held Juhasz liable for trademark infringement. The evidence is undisputed that Juhasz sold Herend pieces not offered by Martin's. Frank Juhasz admitted in his deposition that "at least 50 percent of what we sell, they don't sell." Some of the pieces, such as figurines of guinea hens and rabbits, were completely different pieces from those sold by Martin's. Others had painted patterns and colors different from those offered by Martin's. As a matter of law, such differences are material, since consumer choices for such artistic pieces are necessarily subjective or even fanciful, depending on each consumer's personal artistic tastes. As Juhasz observes in its brief, "[e]ach consumer for a variety or reasons might prefer a bird to a rabbit or stripes to diamonds or red to blue." Juhasz therefore cannot show "the differences are not of the kind that consumers, on average, would likely consider in purchasing the product."[18]

Juhasz argues that its imports, while different, were of the same grade and quality, but *Nestle* flatly rejects this argument,

---

[18]*Nestle,* 982 F.2d at 641.

holding that the plaintiff need not prove that the defendant's imports are of inferior quality to establish trademark infringement, only that they are materially different.[19] We agree with this approach.

Juhasz argues that its conduct is sanctioned under *Matrix Essentials, Inc. v. Emporium Drug Mart, Inc.*[20] In this case, plaintiff Matrix, the trademark owner, manufactured hair care products. It sold its products to distributors who were contractually bound to sell only to licensed cosmetologists. Defendant Emporium, a discount retailer, began selling the products and Matrix sued for trademark infringement. We held that Emporium had not violated the Lanham Act. We reasoned that Emporium's stocking of genuine Matrix products did not create a likelihood of consumer confusion.

*Matrix* is distinguishable in that it was not a parallel importer case, where the territorial scope of the trademark was in issue. As explained above, trademark protection can extend to an owner's efforts to maintain the value and goodwill of the trademark in a particular territory, where the owner has endeavored to confine the use of the trademark to certain goods. Moreover, the goods sold by the defendant in *Matrix* and the authorized retailers were not materially different. The court noted that the Matrix products sold by Emporium "were the same products available in

_____

[19]*Id.* at 636, 640.

[20]988 F.2d 587 (5th Cir.1993).

11

salons."[21]

Juhasz also relies on *NEC Electronics v. CAL Circuit Abco*[22] and *Weil Ceramics and Glass, Inc. v. Dash.*[23] In these cases the courts held that gray market importers of genuine goods were not liable for trademark infringement. However, both cases are distinguishable from our case because the goods were identical to those sold by the authorized American distributors.[24]

Juhasz claims that its sales of Herend porcelain are allowed under the "first sale" rule. Under this rule, recognized in *NEC Electronics,* "[t]rademark law *generally* does not reach the sale of *genuine* goods bearing a true mark even though such sale is without the mark owner's consent. Once a trademark owner sells his product, the buyer *ordinarily* may resell the product under the original mark without incurring any trademark law liability."[25] An analogous and better known first sale rule is recognized in the copyright law, and is indeed codified in the Copyright Act.[26] This

_____

[21]*Id.* at 589.

[22]810 F.2d 1506 (9th Cir.1987).

[23]878 F.2d 659 (3d Cir.1989).

[24]*NEC Electronics,* 810 F.2d at 1508-09; *Weil,* 878 F.2d at 668 & n. 11 (noting that, if goods had been materially different, "that fact would provide a stronger argument for [plaintiff's] claim of trademark infringement.").

[25]*NEC Electronics,* 810 F.2d at 1506 (emphasis added), *quoted in Matrix,* 988 F.2d at 590, 593.

[26]17 U.S.C. § 109(a) ("Notwithstanding the provisions of section 106(3), the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or

12

rule "finds its origins in the common law aversion to limiting the alienation of personal property."[27] As one court has explained, the rationale behind the rule is that after the first sale, "the policy favoring a copyright monopoly for authors gives way to policies disfavoring restraints of trade and limitations on the alienation of personal property...."[28] Similar policies underlie recognition of a first sale rule in trademark law.

We conclude that this rule does not protect Juhasz. First, the rule applies only to identical genuine goods. No one would argue, for example, that a seller of fake Rolex watches or Gucci bags, or pirated compact discs, could escape liability by showing that he was merely reselling the fakes after purchasing them from the manufacturer of the pirated works.[29] And as *Nestle* explains, "although it has been said that "[t]rademark law generally does not reach the sale of genuine goods bearing a true mark even though such sale is without the mark owner's consent,' the maxim does not apply when genuine, but unauthorized, imports differ materially from authentic goods authorized for sale in the domestic market.... [A]n unauthorized importation may well turn an otherwise "genuine'

---

phonorecord.").

[27]*Sebastian Int'l Inc. v. Consumer Contacts (PTY) Ltd.,* 847 F.2d 1093, 1096 (3d Cir.1988).

[28]*Parfums Givenchy, Inc. v. C. & C Beauty Sales, Inc.,* 832 F.Supp. 1378, 1388 (C.D.Cal.1993).

[29]Again, looking to the analogous copyright first sale rule, the Copyright Act recognizes that the first sale rule only applies to a copy "lawfully made under this title." 17 U.S.C. § 109(a).

product into a "counterfeit' one."[30]

Further, applying the first sale rule to an unauthorized importer such as Juhasz would mean that the gray-market importer would always escape liability. Unauthorized importers are *never* the first seller. They always purchase the goods from the manufacturer and owner of the trademark or an intermediary, and resell the goods in violation of an agreement the manufacturer has with the exclusive distributor, or a policy of the manufacturer barring the sale of the goods in a particular geographic market. Yet since 1923, when the Supreme Court ruled in *Katzel,* courts have held that such sales can sometimes violate the trademark laws. If Juhasz were correct, then the defendants in *Katzel, Nestle* and *OAA* would have escaped liability, since they too resold genuine products bearing genuine marks.

We conclude, however, that the permanent injunction is too broad in light of the first sale rule. The injunction prohibits Juhasz from "distributing, advertising or selling in the United States products which are physically different from but which bear the same federally registered trademark No. 1,816,915 as genuine Herend products which are *at that time being sold* in the United States by plaintiffs." By its terms, Juhasz is barred from selling pieces that Martin's previously imported as appropriate for the United States market but which are no longer being imported by Martin's. While plaintiffs should be allowed to maintain the territorial integrity of the trademark by limiting which porcelain

---

[30]*Nestle,* 982 F.2d at 638 (quoting *NEC,* 810 F.2d at 1509).

pieces are offered for sale in this country, they should not be heard to complain that the trademark is infringed when a good previously approved for sale is deleted from Martin's current catalogue. In such circumstances the first sale rule's policies of limiting restraints on trade and alienation of personal property outweigh the trademark owner's right to control its goodwill through an exclusive distributorship arrangement.

Even plaintiffs conceded below, in one of their filings, that their proposed permanent injunction "would not prohibit Defendants from selling products which Plaintiffs previously imported and sold in the United States, even if such products are not presently sold by Plaintiffs here, since Plaintiffs' previous sale in the U.S. would constitute a "first sale' of such products." Accordingly, the injunction should be modified to allow Juhasz to sell all pieces which have ever been sold by plaintiffs in the United States.

We further hold that the injunction should make clear that Juhasz is not limited to selling individual pieces which Martin's has imported and sold first in this country. To hold otherwise would require Juhasz to establish the provenance of each individual piece. Herend pieces, though beautiful and distinctive, are mass produced and should not be treated the way the art world treats an original Picasso. As long as plaintiffs have ever approved a piece for importation and sale in this country, Juhasz is free to sell any individual piece of the same quality from the same product line. Juhasz is, for example, allowed to sell any Herend piece

15

offered in a Martin's catalogue. The Lanham Act protects the trademark; it does not protect the exclusive distributorship agreement per se. In addition, the injunction should be modified to allow the sale of Herend pieces which were imported to this country before Martin's became Herendi's exclusive distributor in 1957. We can see no basis for holding that plaintiffs had a right to render such pieces "counterfeit" by choosing, decades ago, not to select them for importation after they created the exclusive distributorship.

B. *Damages*

Juhasz complains that the district court erred in awarding damages. Under the Lanham Act the plaintiff is entitled to recover defendant's profits and "any damages sustained by the plaintiff."[31] Further:

> In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case.[32]

Great latitude is given the district court in awarding damages under the Lanham Act, "which expressly confers upon the district judges wide discretion in determining a just amount or recovery for

---

[31]15 U.S.C. § 1117(a).

[32]*Id.*

16

trademark infringement."[33]

Plaintiffs offered an accounting expert who had reviewed Juhasz's business records. She relied on Frank Juhasz's deposition testimony that at least 50 percent of the Herend pieces it sold were not products sold by Martin's in the United States. He admitted that these were pieces that Herendi "intended to sell in other countries" and that "had never been seen on this market." The expert found that the business records were inconsistent, but estimated Juhasz's sales of infringing goods (50 percent of gross sales of Herend goods) during the 1991-1994 period at $238,541. She calculated damages based on infringing sales and plaintiffs' lost profits amounting to $403,000. She further opined that inventory records indicated inventory several times higher than the inventory testified to by defendants and discovered by plaintiffs on the date of the seizure. She testified that the damages would be significantly higher ($350,000) if this additional inventory were taken into account. She did not take into account any damage to plaintiffs' reputations, or any pre-1991 or post-1994 sales by Juhasz.

The jury found damages of $685,000, and the court awarded this amount. While the evidence of damages could have been more precise, we conclude that the award should be affirmed, given the broad discretion accorded the district court in deciding damages up to three times the amount of actual damages found.

---

[33]*Holiday Inns, Inc. v. Alberding,* 683 F.2d 931, 935 (5th Cir.1982).

17

C. *Attorney's Fees*

The district court awarded attorney's fees of $328,825 for the entirety of the fees incurred by plaintiffs in prosecuting this action. Plaintiffs sought attorney's fees under 15 U.S.C. § 1117(a), which provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." We have noted that the legislative history of this statute suggests that the exceptional case is one in which the defendant's trademark infringement "can be characterized as "malicious,' "fraudulent,' "deliberate,' or "willful,' " and that it "has been interpreted by courts to require a showing of a high degree of culpability."[34]

The court erred in finding that this is an "extraordinary" case meriting the award of attorney's fees. Suffice it to say that the law of gray market goods and "parallel importers" is a difficult subject. The district court itself erred in the breadth of the injunction it ordered, as explained above. Likewise, plaintiffs and their able counsel incorrectly believed that the ex parte seizure provision of the Lanham Act applied to the gray market goods in issue, as discussed below. Juhasz's counsel erred in advising it, after the ex parte seizure, that Juhasz's conduct was legal under *Matrix.* The notion that a jeweler can violate the trademark laws by importing and selling genuine porcelain with a genuine trademark borders on the counterintuitive, even to those seasoned in the law. We can find no evidence in the record that

---

[34]*Texas Pig Stands, Inc. v. Hard Rock Cafe Int'l, Inc.,* 951 F.2d 684, 697 (5th Cir.1992).

18

Juhasz knew at the time of its actions that it was violating the law.  Frank and Judit Juhasz swore in post-trial affidavits that they only sold genuine Herend porcelain, and did not believe that the sales were illegal.  When Judit Juhasz was asked by her counsel at trial whether she believed the items taken during the seizure were counterfeit, plaintiffs successfully objected on grounds that the question was irrelevant.  Even after the ex parte seizure, Juhasz obtained an opinion of legal counsel who advised that their sales of gray market goods were "not an infringement of anyone's rights in accordance with United States law."  Plaintiffs did not demonstrate the kind of highly culpable conduct meriting an award of attorney's fees.

D. *Wrongful Seizure Counterclaim*

Juhasz complains that the district court erred in granting summary judgment against it on its counterclaim for wrongful seizure.  Simultaneously with the filing of their original complaint, plaintiffs sought and obtained a order of seizure pursuant to 15 U.S.C. § 1116(d), which provides in pertinent part:

> (1)(A) In the case of a civil action arising under section 1114(1)(a) of this title ... with respect to a violation that consists of using a counterfeit mark in connection with the sale, offering for sale, or distributions of goods or services, the court may, upon ex parte application, grant an order ... providing for the seizure of goods or counterfeit marks involved in such violation and the means of making such marks, and records documenting the manufacture, sale or receipt of things involved in such violation.
>
> (B) As used in this subsection the term "counterfeit mark" means—
>
>> (i) a counterfeit of a mark that is registered ... whether or not the person against whom relief is sought knew such mark was so registered ...

19

but such term does not include any mark or designation used on or in connection with goods or services of which the manufacture[35] or producer was, at the time of the manufacture or production in question authorized to use the mark or designation for the type of goods or services so manufactured or produced, by the holder of the right to use such mark or designation.

Given the draconian nature of this ex parte remedy, providing for the seizure of defendant's wares and records without prior notice to the defendant and with the assistance of law enforcement officers,[36] we believe that it should be narrowly construed. By its terms, this provision does not apply to gray market goods such as the ones at issue here. It does not apply to goods having a mark placed on the product "at the time of the manufacture" by a manufacturer "authorized to use the mark ... by the holder of the right to use such mark." Here, the owner of the right to use the Herend trademark—Herendi—is also the manufacturer, and was of course authorized to place its own trademark on its own goods at the time of its own manufacture. Gray market goods are not subject to this provision even if they are materially different from those selected for the domestic market. Plaintiffs had no right to conduct an ex parte seizure of authentic Herend pieces from Juhasz. Hence, the district court erred in ruling that the counterclaim should fail because plaintiffs "seized several porcelain products that were different from the products that Herend sells in the United States."

The result would be different if plaintiffs had seized fake

---

[35]So in original. Probably should be "manufacturer."

[36]*See* 15 U.S.C. § 1116(d)(9).

20

pieces with a forged trademark. The seizure order was based on an affidavit of Martin's president, who believed that several of the pieces Martin's had purchased from Juhasz were not authentic Herend porcelain. Plaintiffs never established as a matter of law that Juhasz was selling fakes, and there is substantial evidence to the contrary. At trial plaintiffs called Herendi's commercial director and its lead painter, undoubtedly two of the world's leading experts on the authenticity of Herend porcelain, and neither identified a single piece sold by Juhasz as having a fake trademark.

Under 15 U.S.C. § 1116(d)(11), "[a] person who suffers damage by reason of a wrongful seizure under this subsection has a cause of action against the applicant for the order under which such seizure was made, and shall be entitled to recover such relief as may by appropriate, including damages for lost profits, cost of materials, loss of good will, and punitive damages in instances where the seizure was sought in bad faith...." The court erred in granting judgment in favor of plaintiffs on this counterclaim after the plaintiffs rested.

E. *Contempt Order*

After the court entered its permanent injunction, plaintiffs sought a civil contempt order, alleging that Juhasz was violating the injunction. After a hearing, the court found that Juhasz had sold and advertised for sale Herend pieces materially different from those offered by Martin's. The court entered a contempt order, which ordered that Juhasz: (1) return all physically

21

different Herend products and all related brochures, price lists and other advertising materials; (2) turn over records documenting the sale of physically different products, so that plaintiffs could in the future seek recovery of lost revenues; (3) identify and send a letter to all persons who had received physically different products or advertising for such products, stating that defendants sold them in violation of the injunction; (4) pay plaintiffs $6300 as reasonable attorney's fees incurred in bringing the contempt proceeding; (5) serve within 12 days a declaration describing its compliance with the contempt order; and (6) beginning 10 days after entry of the contempt order, pay a fine of $50 per day for each day of non-compliance with the order.

We review an order of contempt under the abuse of discretion standard, and the district court's underlying fact findings under the clearly erroneous standard.[37]

We note that the contempt order should not be reversed simply because we now hold, above, that the injunction the court issued was too broad. The Supreme Court has recognized "the long-standing rule that a contempt proceeding does not open to reconsideration the legal or factual basis of the order alleged to have been disobeyed and thus become a retrial of the original controversy."[38] Juhasz was obliged to obey the injunction pending reconsideration by the district court or appellate review.

---

[37]*Travelhost, Inc. v. Blandford,* 68 F.3d 958, 961 (5th Cir.1995).

[38]*Maggio v. Zeitz,* 333 U.S. 56, 69, 68 S.Ct. 401, 408, 92 L.Ed. 476 (1948).

Juhasz argues that the contempt order was one of criminal contempt requiring proof beyond a reasonable doubt. We disagree. As we explained in *Lamar Financial Corp v. Adams:*[39]

> If the purpose of the sanction is to punish the contemnor and vindicate the authority of the court, the order is viewed as criminal. If the purpose of the sanction is to coerce the contemnor into compliance with a court order, or to compensate another party for the contemnor's violation, the order is considered purely civil. A key determinant in this inquiry is whether the penalty imposed is absolute or conditional on the contemnor's conduct.[40]

The purpose of the contempt order was to compel Juhasz to comply with the previously entered injunction. The modest attorney's fees awarded were compensation to the plaintiffs for the costs of prosecuting the contempt motion, and the monetary sanctions of $50 per day were prospective only, and thus conditioned on the contemnor's future compliance with the injunction.

Juhasz argues that it only sold pieces obtained in the "secondary market" after the injunction issued, and that the injunction was so vague that it did not understand that such sales were prohibited. The injunction plainly prohibited Juhasz from "distributing, advertising or selling in the United States products which are physically different from but which bear the same federally registered trademark No. 1,816,915 as genuine Herend products which are at that time being sold in the United States by plaintiffs." There is no exception for sales of pieces purchased

---

[39]918 F.2d 564 (5th Cir.1990).

[40]*Id.* at 566 (citations omitted).

23

in the "secondary market."

Juhasz appears to complain that the scope of the injunction became confused when plaintiffs themselves conceded in one of their pleadings (discussed above) that their proposed permanent injunction "would not prohibit Defendants from selling products which Plaintiffs previously imported and sold in the United States, even if such products are not presently sold by Plaintiffs here, since Plaintiffs' previous sale in the U.S. would constitute a "first sale' of such products."  This interpretation of the injunction would not allow Juhasz to sell pieces unless they had first been imported to this country and sold by Martin's.  The evidence showed that Juhasz was not selling pieces first sold in this country by Martin's.  Regardless of this statement, the injunction the court entered had no exception for secondary market purchases.  Further, plaintiffs offered evidence that, after the injunction issued, Juhasz sold and advertised for sale Herend pieces that plaintiffs had never sold in the United States.

We conclude that the fact findings forming the basis for the contempt order are not clearly erroneous, and that the district court did not abuse its discretion in issuing the contempt order.

CONCLUSION

For the foregoing reasons, we conclude that an injunction was properly issued against Juhasz, but that the injunction entered by the district court was too broad;  that plaintiffs are entitled to damages but are not entitled to attorney's fees;  that the contempt order should be affirmed;  and that the summary judgment against

24

Juhasz on its wrongful seizure counterclaim should be reversed. Accordingly, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

AFFIRMED in part, REVERSED in part and REMANDED.