# United States Court of Appeals for the Federal Circuit

04-1460

SKF USA INC.,

Appellant,

v.

INTERNATIONAL TRADE COMMISSION,

Appellee,

and

BEARINGS LIMITED,

Intervenor,

and

McGUIRE BEARING COMPANY,

Intervenor.

———————————————

DECIDED: September 14, 2005

———————————————

Before LOURIE, Circuit Judge, ARCHER, Senior Circuit Judge, and GAJARSA, Circuit Judge.

LOURIE, Circuit Judge.

SKF USA, Inc. appeals from the judgment of the United States International Trade Commission concluding that § 337 of the Tariff Act of 1930, 19 U.S.C. § 1337 (2000), had not been violated by the importation, sale for importation, and sale within

the United States after importation of certain SKF-marked bearings. In re Certain Bearings & Packaging Thereof, Inv. No. 337-TA-469 (Dep't Commerce May 24, 2004) ("Final Determination"). Because substantial evidence supports the Commission's conclusion that all or substantially all of SKF USA's bearings are not predictably and consistently accompanied by post-sale services and its consequent conclusion that there was no likelihood of confusion between SKF USA's goods and the gray market goods, we affirm.

BACKGROUND

SKF USA, Inc. is a manufacturer of ball bearings located in the United States. It produces SKF-marked bearings in the United States and also imports SKF-marked bearings that are manufactured abroad by SKF Manufacturing Units. SKF USA and SKF Manufacturing Units are owned by the same parent company, AB SKF, a Swedish corporation.

SKF USA sells bearings at all levels of the market, both directly to large original equipment manufacturers and to end users. It sells its products through a network of authorized distributors, as well as to some "nonauthorized" distributors, i.e., distributors to which SKF USA sells but with whom SKF USA does not have an "Industrial Distributor Agreement." Such nonauthorized goods, made by an SKF entity, but not sold or authorized for sale in the United States, are often known as "gray market goods" or simply "gray goods." Additionally, SKF USA itself imports bearings distributed by its foreign manufacturing units, and SKF USA's authorized distributors have themselves purchased gray market bearings, including some from companies that were respondents in the Commission's § 337 investigation.

04-1460                                    2

In April 2002, SKF USA filed a complaint at the Commission against fourteen respondents, alleging they violated § 337 by (1) infringement of various registered trademarks in violation of section 32 of the Lanham Act, 15 U.S.C. § 1114(1)(a); (2) infringement of common law trademarks; (3) false representation of source in violation of section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); (4) dilution of registered and common law trademarks in violation of section 43(c)(1), 15 U.S.C. § 1125(c)(1); and (5) false advertising in violation of section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

In April 2003, an Administrative Law Judge ("ALJ") issued an initial determination, finding that four of the respondents—Bohls Bearing and Transmission Service, CST Bearing Company, Bearings Limited, and McGuire Bearings Company—had violated § 337 by infringement of SKF USA's registered and common law trademarks and making a false designation of source. In re Certain Bearings & Packaging Thereof, Inv. No. 337-TA-469 (Dep't Commerce Apr. 10, 2003) ("Initial Determination"). The ALJ applied the "material differences" test set forth in Gamut Trading Co. v. International Trade Commission, 200 F.3d 775 (Fed. Cir. 1999), and found that there were no physical material differences between the bearings that SKF USA sold or authorized for sale and those bearings that were imported and sold by the respondents. However, the ALJ determined that this court has not expressly required that material differences be physical in nature. Instead, he determined that the existence and extent of technical and engineering services may constitute material differences in terms of § 337 trademark liability despite not being physical

04-1460                                      3

characteristics, consistent with the test set forth in Gamut. Initial Determination, slip op. at 64.

SKF USA employs a number of "industry specialists," engineers who have expertise in equipment used in particular fields, to provide on-going technical and engineering assistance to its customers. Id., slip op. at 77. Those services consist of on-site services and "hotline" support. Its specialists receive extensive and on-going training each year, and they perform such tasks as troubleshooting, technical support, installation supervision, and end user training. Id. The ALJ found that "SKF USA will provide post-sale customer support to customers who buy SKF bearings from SKF USA authorized distributors regardless of where the SKF bearings came from." Id., slip op. at 78. He determined that even if "SKF bearings came from the gray market," "SKF USA will provide post-sale customer service support." Id. The ALJ also found that SKF USA provided hotline support as another method of customer service. He heard testimony that SKF USA, through its hotline, dealt with such problems as maintenance, installation, and lubrication of its products. Id., slip op. at 79. He determined that SKF USA took reasonable steps to prevent purchasers of SKF bearings from nonauthorized sources from using its hotline services. Id.

The ALJ determined that the SKF USA bearings and the gray market bearings differed materially in the post-sale technical services offered with them, particularly on-site services and hotline support. Because SKF USA presented evidence that customers would likely be confused as to the degree of post-sale technical and engineering services to which they were entitled, and because "the evidence of record [was] devoid of comparable services by Respondents," id., slip op. at 77, the ALJ found

04-1460                                    4

that "there [was] a likelihood of confusion and therefore a violation of Section 337," id., slip op. at 80.  The ALJ thus held that the four respondent companies violated § 337 by infringing SKF USA's registered and common law trademarks and by falsely designating the origin of the ball bearings.  The ALJ, however, determined that SKF USA had not carried its burden of proving false advertising or trademark dilution.  Id., slip op. at 239.

Thereafter, SKF USA, the four respondents, and the Commission's investigative attorney filed a joint petition for review by the full Commission, each contesting various aspects of the ALJ's initial determination.  Upon review, however, the Commission determined that additional information was needed and remanded the case for further fact-finding in August 2003.  Specifically, the Commission requested information relating to SKF USA's sales through "alternate" channels of distribution, including sales on the surplus market and the vehicle service market, and the warranties, product recall procedures, and post-sale technical services passed on to the end user relating to those sales.  The ALJ completed that additional fact finding in December 2003, and the case was returned to the full Commission in January 2004.

In May 2004, the Commission issued its final decision reversing the ALJ's initial decision.  First, it agreed with the ALJ that the question whether material differences can be found in a gray market case based solely on nonphysical differences is a matter of first impression for the Commission and an issue not yet specifically addressed by this court.  The Commission further noted that this court did not hold in Gamut that a material difference must be a physical one in order to show gray market trademark infringement, and it declined to create a per se rule that material differences must be physical in nature.  Final Determination, slip op. at 25-26.

04-1460                                    5

The Commission concluded that the post-sale services did not accompany certain of SKF USA's sales, including alternate channels of distribution consisting of sales by (1) Chicago Rawhide, SKF USA's business unit relating to the vehicle service market, (2) Roller Bearing Company/Tyson Bearing Company, (3) gray market distributors, (4) the surplus market, and (5) nonauthorized distributors to end users. Id., slip op. at 39, 42, 55. Sales from these alternate channels of distribution amounted to 12.6% of SKF USA's total bearing sales. Id., slip op. at 39. Despite the undisputed 87.4% of SKF USA bearing sales to authorized distributors that were supported by post-sale services, the Commission determined that the 12.6% of SKF USA's bearing sales was sufficient to defeat SKF USA's argument that the material difference accompanied all or substantially all of its marked bearings.

The Commission considered SKF USA's assertion that "a trademark owner's non-adherence to its policies or practices with respect to some of its sales does not defeat a claim of infringement if those 'non-conforming' sales are insignificant." Id., slip op. at 57. SKF USA argued that in Warner-Lambert Co. v. Northside Development Corp., 86 F.3d 3 (2d Cir. 1996), a preliminary injunction was granted even though 4.4% of the plaintiff's cough drops were found to be nonconforming goods, i.e., they did not comply with the freshness date standard that was alleged to have been violated by the infringing goods. However, the Commission rejected SKF USA's argument that Warner-Lambert held that certain of a trademark owner's nonconforming goods may be ignored if they are of de minimis amounts. Instead, the Commission stated that that case stood for the proposition that, "in order to be entitled to relief against a later seller of nonconforming goods, a trademark holder who sells nonconforming goods must

show that the later sales measurably diminish the value of an already partially devalued mark." Final Determination, slip op. at 62. The Commission held that SKF USA could not prevail under Warner-Lambert because SKF USA failed to prove that its trademark had been further devalued by the respondents' sales. Id., slip op. at 63.

The Commission agreed with the respondents that a trademark owner must show that "all or substantially all" of its marked goods are accompanied by the characteristic that is alleged to be a material difference. It relied on the Fifth Circuit's decision in Martin's Herend Imports, Inc. v. Diamond & Gem Trading USA, Co., 112 F.3d 1296 (5th Cir. 1997), which held that a trademark owner could not prevent a gray market importer from importing and selling goods of the same quality from the same product line of trademarked porcelain pieces that previously had been imported, offered for sale, or sold by the trademark holder. The Commission held that if SKF USA had sold or authorized for sale bearings to which post-sale services did not predictably and consistently attach, those services cannot be considered "integral" to the goods and cannot constitute the basis for finding a material difference. Final Determination, slip op. at 63.

The Commission examined the ALJ's review of the alleged material difference between SKF USA's post-sale technical and engineering support of the domestic and the gray market goods. It disagreed with the ALJ's decision to limit his analysis of the material differences to bearings sold through authorized channels of distribution and found that the ALJ's broad findings regarding provision of support to end users were not supported by the record. Instead, it also considered SKF USA's sales through the so-called "alternate" channels of distribution, i.e., nonauthorized distributors, gray market

distributors, the surplus market, and sales by Roller Bearing Company/Tyson Bearing Company, a licensee of SKF USA. The Commission determined that SKF USA chose to distribute through authorized and nonauthorized distributors in order to maximize its bearing sales and that by doing so, SKF USA undermined its own quality control and failed to provide the same level of service to bearings sold through alternate channels. Id., slip op. at 51-52. It also discounted SKF USA's hotline services as constituting a material difference in the bearings because the evidence showed that consumers in alternate channels faced severe difficulty in obtaining SKF USA post-sale services. Id., slip op. at 52, 55. The Commission thus concluded that SKF USA's bearings did not differ materially from respondents' bearings because "SKF USA has authorized the sale of SKF-marked bearings . . . [that] are not predictably and consistently accompanied by post-sale technical and engineering services." Id. Accordingly, the Commission reversed the ALJ's decision and held that the respondent companies had not infringed SKF USA's trademark and violated § 337. SKF USA appeals; we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(6).

DISCUSSION

Pursuant to the Administrative Procedure Act, we review the factual findings of the Commission under the substantial evidence standard. See 19 U.S.C. § 1337(c) (2000); 5 U.S.C. § 706(2)(E) (2000). We thus will not overturn the Commission's factual findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Finnigan Corp. v. Int'l Trade Comm'n, 180 F.3d 1354, 1362 (Fed. Cir. 1999) (quoting Surface Tech., Inc. v. Int'l Trade Comm'n, 801 F.2d 1336, 1340-41 (Fed. Cir. 1986)). We review the Commission's legal

determinations de novo.  See 5 U.S.C. § 706(2)(A) (2000); Checkpoint Sys. v. Int'l Trade Comm'n, 54 F.3d 756, 760 (Fed. Cir. 1995).

A.    Material Difference Standard

The first issue we address is whether the distinction between domestic goods and gray market goods must be physical in nature in order to satisfy the "material difference" test, an issue of first impression for this court.  SKF USA is essentially in agreement with the Commission that differences between authorized goods and gray market goods need not be physical to be material.  The intervenors, however, argue that material differences must be physically manifested in the product or its packaging.  They assert that the material difference test compares products, not sellers or the services they offer, and that the difference must be shown to be integral to the product.

We agree with SKF USA and the Commission and hold that physical material differences are not required to establish trademark infringement involving gray market goods.  That is because trademarked goods originating from the trademark owner may have nonphysical characteristics associated with them, including services, such that similar goods lacking those associated characteristics may be believed by consumers to have originated from the trademark owner and, lacking such traits, may mislead the consumer and damage the owner's goodwill.

Generally, gray market goods are defined as "genuine goods that . . . are of foreign manufacture, bearing a legally affixed foreign trademark that is the same mark as is registered in the United States; gray goods are legally acquired abroad and then imported without the consent of the United States trademark holder."  Gamut, 200 F.3d at 778.  "The principle of gray market law is that the importation of a product that was

04-1460                                         9

produced by the owner of the United States trademark or with its consent, but not authorized for sale in the United States, may, in appropriate cases, infringe the United States trademark." Id. at 777.

In Gamut, a decision of this court involving gray market goods, the Kubota Corporation filed a complaint at the Commission, alleging that Gamut and other respondents violated § 337 of the 1930 Tariff Act by importing from Japan and reselling in the United States used tractors bearing the mark "Kubota" that had been properly affixed in Japan. Id. at 780. The ALJ in that case determined that the respondents infringed Kubota's trademark because twenty-four models of the "Kubota" tractors imported by Gamut differed materially from the corresponding tractors imported by Kubota. Specifically, the ALJ found that the respondents' imported Japanese tractors lacked English language warning labels and that Kubota-US dealers did not have English language operator or service manuals for those models. Id. The ALJ determined that those differences in labeling, service, and parts for the imported Kubota tractors were in part relevant to the finding of a material difference between the authorized tractors and the gray market, used tractors. Id. at 782. The ALJ concluded that the respondents had infringed Kubota's trademark and violated § 337. Id. Gamut and the other respondent companies appealed, and the full Commission affirmed.

We began our analysis in Gamut with the fundamental inquiry in gray market goods cases: "whether there are differences between the foreign and domestic product and if so whether the differences are material." Id. at 779. We stated that "[t]he courts have applied a low threshold of materiality, requiring no more than showing that consumers would be likely to consider the differences between the foreign and domestic

products to be significant when purchasing the product, for such differences would suffice to erode the goodwill of the domestic source." Id. That inquiry involves a question of fact.

The rationale underlying that minimal requirement is that "[a]ny higher threshold would endanger a manufacturer's investment in product goodwill and unduly subject consumers to potential confusion by severing the tie between a manufacturer's protected mark and its associated bundle of traits." Id. at 779-80 (quoting Societe Des Produits Nestle v. Casa Helvetia, Inc., 982 F.2d 633, 641 (1st Cir. 1992) ("Nestle")). We explained that "the consuming public, associating a trademark with goods having certain characteristics, would be likely to be confused or deceived by goods bearing the same mark but having materially different characteristics." Id. at 779. Thus, by distinguishing domestic goods from gray market goods that bear a material difference, thereby finding trademark infringement, we upheld "the two fundamental policies of trademark law: to protect the consumer and to safeguard the goodwill of the producer." Id. at 782. Accordingly, because we held that "[s]ubstantial evidence supports the Commission's finding that consumers would consider the differences between the used imported tractors and the authorized Kubota-US tractors to be important to their purchasing decision, and thus material," id., we affirmed the Commission's decision.

We here carry that reasoning a step further and make explicit what may have only been implicit in Gamut. We hence conclude that, consistent with the Gamut decision, material differences that preclude infringement by gray goods may be physical or nonphysical.

Our reasoning is as follows: first, although the differences in labeling, parts, and structural features of the tractors certainly were mostly physical in nature, importantly, the Gamut court used only the term "material differences," and not "physical differences," to characterize the precise test to be applied in the gray market goods context. Second, as the Commission in the instant case correctly pointed out, although some of the material differences in Gamut were indeed physical, we there relied on cases that held that nonphysical material differences are sufficient to avoid trademark infringement. For example, the Gamut decision relied on Nestle, a First Circuit case in which that court stated in a footnote, "[w]e think the appropriate test should not be strictly limited to physical differences. Other sorts of differences—differences in, say, warranty protection or service commitments—may well render products non-identical in the relevant Lanham Act sense." 982 F.2d at 639 n.7. Additionally, the Gamut court stated that "[d]ifferences in labeling and other written materials have been deemed material, on the criteria of likelihood of consumer confusion and concerns for the effect of failed consumer expectations on the trademark holder's reputation and goodwill," favorably citing Osawa & Co. v. B & H Photo, 589 F. Supp. 1163 (S.D.N.Y. 1984), and Fender Musical Instruments Corp. v. Unlimited Music Center, Inc., 35 USPQ2d 1053 (D. Conn. 1995). Gamut, 200 F.3d at 781. In those cases, material differences were found based in part on differences in services and guarantees between authorized and gray market goods, as well as accompanying documents such as instruction manuals, nonphysical traits that were nevertheless determined to constitute a material difference to consumers.

We are thus satisfied that the Commission's conclusion that nonphysical traits may constitute material differences is consistent with our case law and promotes the sound, established policies underlying trademark protection. Accordingly, we hold that material differences need not be physical in order to establish trademark infringement in gray market cases.

SKF USA argues that the Commission misinterpreted Martin's Herend and wrongly required that "all or substantially all" of SKF USA's authorized bearings be accompanied by the post-sale technical and engineering support, the allegedly material difference that distinguished SKF USA's goods from the gray goods. It alleges that the Commission erroneously combined the material difference standard in "confusion-as-to-source" case law with the diminution of value standard in "deteriorated product" cases such as Warner-Lambert. That elevated standard, SKF USA argues, constituted reversible legal error. Instead, SKF USA asserts that the proper inquiry should have been simply whether the mark holder has established that a material difference exists between categories of products. It maintains that it has met that burden and that fully 97.4% of its sales—the undisputed 87.4% of authorized sales, plus sales by Chicago Rawhide to the vehicle service market—are supported by post-sale technical services, consisting of both on-site services and hotline support, while respondents did not provide any such post-sale support for any of their sales. Thus, SKF USA asserts, it has shown that a sufficient number of its goods are materially different from the gray goods. Citing Nitro Leisure Products, L.L.C. v. Acushnet Co., 341 F.3d 1356 (Fed. Cir. 2003), SKF USA also argues that the Commission failed to account for channel-specific factors in SKF USA's sales. That is, it argues that consumers who purchase bearings in

the alternate channels of distribution have different expectations of service from SKF USA than do consumers from traditional, authorized distributors, so the alternate channels should not be considered in the aggregate. Furthermore, SKF USA contends that the Commission's statement that certain of its goods were not "predictably and consistently" accompanied by the asserted material difference was in error. It argues that the Commission's findings relating to SKF USA's dealings in the surplus market and the vehicle service market were unsupported by the record.

The Commission responds that it properly required SKF USA to show that substantially all of its authorized bearings were accompanied by the characteristics claimed to be a material difference, citing Martin's Herend. Because not all of the SKF USA-authorized bearings were accompanied by the post-sale services, the Commission asserts that it was correct in holding that the gray market bearings were identical to SKF USA-authorized bearings and should not be found to infringe SKF USA's trademark. The Commission further argues that the "alternate channels of distribution" argument advanced by SKF USA is not relevant to a "material difference" analysis of trademark infringement. It asserts that the "material difference" standard focuses on the goods themselves, not their channels of distribution. The Commission contends that, because some portion of the SKF-marked bearings are not predictably and consistently supported by post-sale technical services, especially the bearings sold through the alternate channels, those services cannot be considered integral to the goods and cannot be relied upon to show a material difference between SKF USA's bearings and the respondents' bearings. It argues that SKF USA's argument that consumer

04-1460                                      14

expectations are different in the alternate channels of distribution lacks evidentiary support.

First, we agree with the Commission that a plaintiff in a gray market trademark infringement case must establish that all or substantially all of its sales are accompanied by the asserted material difference in order to show that its goods are materially different. If less than all or substantially all of a trademark owner's products possess the material difference, then the trademark owner has placed into the stream of commerce a substantial quantity of goods that are or may be the same or similar to those of the importer, and then there is no material difference. Indeed, if it cannot be said that substantially all of a trademark owner's goods are accompanied by the asserted characteristic, then it may properly be concluded that, in effect, there exists no material difference between the trademark owner's goods and the allegedly infringing goods. We have reasoned before that "the consuming public, associating a trademark with goods having certain characteristics, would be likely to be confused or deceived by goods bearing the same mark but having materially different characteristics." Gamut, 200 F.3d at 779. Conversely, then, a trademark owner's argument that consumers would be confused by gray goods lacking an asserted material difference from the authorized goods is inconsistent with the owner's own sale of marked goods also lacking that material difference from its own authorized goods. To permit recovery by a trademark owner when less than "substantially all" of its goods bear the material difference from the gray goods thus would allow the owner itself to contribute to the confusion by consumers that it accuses gray market importers of creating.

Martin's Herend, a decision of a sister circuit, supports that requirement, and we find its reasoning persuasive. In that case, a United States trademark owner alleged that a defendant company importing or selling similarly-marked fine porcelain goods infringed its mark. The defendant argued that the trademark owner itself had sold some of the same porcelain pieces and that there was no material difference between the defendant's product and the trademark owner's product. But the Fifth Circuit held that the defendant was properly held liable for trademark infringement for selling pieces not offered by the trademark owner because those pieces were materially different from the pieces the owner was selling. 112 F.3d at 1302. However, the Fifth Circuit also held that "[a]s long as plaintiffs have ever approved a piece for importation and sale in this country, [the defendant] is free to sell any individual piece of the same quality from the same product line." Id. at 1304. The court reasoned that "[t]he Lanham Act protects the trademark [but] it does not protect the exclusive distributorship agreement per se." Id. In effect, the Fifth Circuit segregated the trademark owner's porcelain items into product lines that were materially different from the defendant's imports and those that were not.

The Commission argues that in Martin's Herend, the sale of even one authorized porcelain piece would have resulted in the denial of relief with respect to all porcelain pieces of "the same quality from the same product line." In the present case, the Commission asserts, the requirement that "all or substantially all" of a plaintiff's goods be accompanied by the alleged material difference in order to seek relief under trademark infringement is entirely consistent with the Fifth Circuit's reasoning. In Martin's Herend as well as in the present case, the sale by the trademark owner of marked goods that lack the alleged material difference weakens the owner's argument

that similar sales by others would damage its mark. Indeed, such a sale may result in the conclusion that the characteristic is not integral to the goods and cannot be the proper basis for the material difference standard.

We reject SKF USA's attempts to distinguish Martin's Herend by arguing that that case involved physical differences, was based on specific product lines, and did not involve complex channels of distribution. SKF USA argues that no cases have required a trademark owner to establish that all of its products are accompanied by the material differences in order to prevail. However, we do not read the Commission's determination to set forth such a strict rule, and we do not go so far as Martin's Herend to hold that the sale of even one authorized item lacking a material difference defeats infringement. Instead, the "all or substantially all" benchmark recognizes that something less than 100% compliance will suffice and certainly permits a small amount of nonconforming goods. A single sale of a nonconforming item typically should not defeat a trademark owner's protection. Accordingly, we agree with the Commission that the test of "all or substantially all" is a fair interpretation of the material difference standard, and we expressly adopt the Commission's holding that a trademark owner must show that all or substantially all of its authorized goods are accompanied by each of the claimed material differences to satisfy that standard.

We also disagree with SKF USA that the Commission wrongly applied Warner-Lambert to require further diminishment of its mark's value. In that case, the Second Circuit held that for a trademark holder "[t]o be entitled to relief against a later seller of non-conforming goods, such a trademark holder must show that the later sales measurably diminish the value of an already partially devalued mark." Warner-Lambert,

86 F.3d at 7. SKF USA argued before the Commission that <u>Warner-Lambert</u> stood "for the proposition that a trademark owner's non-adherence to its policies or practices does not defeat a claim of infringement if those non-conforming sales are insignificant." <u>Final Determination</u>, slip op. at 50. In essence, it argued that its nonconforming sales should be ignored because they were in <u>de</u> <u>minimis</u> amounts. We do not construe the Commission's statements regarding that case as a misapplication of the further diminishment test, and we instead determine that the Commission properly applied the material difference standard.

B.      Sales of SKF USA's Bearings

Next, we consider the Commission's factual findings relating to the amount of SKF USA's sales that allegedly lacked post-sale support. It was undisputed that 87.4% of SKF USA's sales to authorized distributors were supported by the "full panoply" of post-sale technical and engineering services. <u>Final Determination</u>, slip op. at 44-45, 54-55. Regarding the remaining sales, SKF USA sold bearings to the vehicle service market through its Chicago Rawhide business unit. As stated by the Commission, the ALJ found that Chicago Rawhide provided on-site technical services and its own hotline services to its customers. <u>Id.</u>, slip op. at 42-43. In addition, it was able to provide SKF USA's hotline services to customers when necessary. <u>Id.</u>, slip op. at 43. However, the Commission was troubled by the fact that Chicago Rawhide's on-site services were available only on a discretionary basis, based on the size of the customer and whether the customer had a record of multiple problems. <u>Id.</u>, slip op. at 42-43. The Commission relied on the ALJ's remand findings that Chicago Rawhide's on-site technical services were available on a discretionary basis and depended "on the size of the customer

and/or whether a customer has had multiple problems." Id. The Commission also agreed with the respondents' argument that "even in instances where a downstream end user is aware of SKF USA's post-sale technical and engineering services, . . . there is no guarantee that the end user will consistently and predictably receive post-sale technical support services in connection with its SKF bearing purchases." Id., slip op. at 48, 51-52. The Commission thoroughly considered the evidence, including the remand findings made by the ALJ. Although it found that SKF USA presented evidence on the differences in the alternate markets, the Commission determined that "the record contains little probative evidence on consumer expectations, [and] we do not base our decision on consumer expectations." Id., slip op. at 57. It concluded that because the provision of post-sale services by SKF USA or its business unit Chicago Rawhide was discretionary, a consumer was not assured that the goods were "predictably and consistently" accompanied by the post-sale services, and hence that all or substantially all of SKF USA's goods were not accompanied by them. The determinations by the Commission that, because the Chicago Rawhide post-sale services were discretionary, they were not predictably and consistently available to purchasers, and that all or substantially all of the goods were not accompanied by the services are findings of fact, subject to substantial evidence deference by this court. We conclude that those findings were supported by substantial evidence and we must therefore affirm them.

Additionally, the Commission determined that Roller Bearing Company/Tyson Bearing Company provided its own technical services, and that it found "SKF USA's argument that RBC/Tyson provided equivalent post-sale services to those of SKF USA somewhat disingenuous in the face of SKF USA's stated position that no respondent

can provide equivalent services to those of SKF USA because SKF USA's services are per se superior to any services that others could provide." Id., slip op. at 49. The Commission also found that "SKF USA's bearings do not differ materially from respondents' bearings" because "SKF USA has authorized the sale of SKF USA marked bearings by nonauthorized distributors, gray market distributors (including respondents), surplus distributors, and RBC/Tyson which we find are not predictably and consistently accompanied by post-sale technical and engineering services." Id., slip op. at 63. Those are also findings of fact to which we defer.

Finally, we disagree with SKF USA that the Commission erred by focusing too heavily on the services provided to the so-called "alternate channels of distribution." The material difference standard focuses on differences in the goods themselves, not differences in their channels of distribution or the consumer expectations in those channels. Nitro Leisure Products, upon which SKF USA relies, is inapposite; that case dealt with used or refurbished goods, and the trial court in that case did not use a material difference standard. 341 F.3d at 1364 ("The Champion Court recognizes that consumers do not expect used or refurbished goods to be the same as new goods and that for such goods, "material differences" do not necessarily measure consumer confusion."). We discern no error in the Commission's findings or its reliance on the ALJ's factual findings, and we do not disturb those findings on appeal. We therefore conclude that the Commission made no error of law and that its fact-findings were supported by substantial evidence.

We have considered Appellant's remaining arguments and are not persuaded. Accordingly, we affirm the determination of the Commission and hold that SKF USA has

not established that the respondent companies violated § 337 by reason of trademark infringement.

## CONCLUSION

For the aforementioned reasons, we affirm the Commission's determination that SKF USA did not establish a material difference between its own products and those of the respondents based on post-sale technical and engineering services.  We thus affirm the Commission's determination that there was no § 337 violation in the import of the instant ball bearings.

### AFFIRMED