# United States Court of Appeals for the Federal Circuit

04-1588

BOURDEAU BROS., INC.,
SUNOVA IMPLEMENT CO., and OK ENTERPRISES,

Appellants,

v.

INTERNATIONAL TRADE COMMISSION,

Appellee,

and

DEERE & COMPANY,

Intervenor.

David P. Miranda, Heslin Rothenberg Farley & Mesiti P.C., of Albany, New York, argued for appellants. With him on the brief were Nicholas Mesiti and Brett M. Hutton. Of counsel was William A. Zeitler, Sullivan & Worcester, of Washington, DC.

Wayne W. Herrington, Attorney, United States International Trade Commission, of Washington, DC, argued for appellee. On the brief were James M. Lyons, General Counsel, Andrea C. Casson, Acting Assistant General Counsel for Litigation, and Clara Kuehn, Attorney.

Bassam N. Ibrahim, Buchanan Ingersoll, P.C, of Alexandria, Virginia, argued for intervenor. With him on the brief was S. Lloyd Smith. Of counsel was Goutam Patnaik, Burns, Doane, Swecker & Mathis, L.L.P., of Alexandria, Virginia.

Appealed from: United States International Trade Commission

# United States Court of Appeals for the Federal Circuit

04-1588

BOURDEAU BROS., INC.,
SUNOVA IMPLEMENT CO., and OK ENTERPRISES,

Appellants,

v.

INTERNATIONAL TRADE COMMISSION,

Appellee,

and

DEERE & COMPANY,

Intervenor.

_____

DECIDED:  March 30, 2006
_____

Before SCHALL, <u>Circuit Judge</u>, CLEVENGER, <u>Senior Circuit Judge</u>, DYK, <u>Circuit Judge</u>.

CLEVENGER, <u>Senior Circuit Judge</u>.

Appellants Bourdeau Bros., Inc. (Bourdeau), Sunova Implement Co. (Sunova), and OK Enterprises (OK), (collectively, appellants) appeal the decision of the United States International Trade Commission (ITC) affirming the Initial Determination and Recommended Remedy Determination (Initial Determination) of Administrative Law Judge Luckern (ALJ) that the importation of certain Deere European version forage harvesters infringed one or more of Deere's federally registered trademarks, <u>Certain</u>

<u>Agric. Vehicles & Components Thereof</u>, Inv. No. 337-TA-487 (Jan. 13, 2004) (<u>Initial</u>

<u>Determination</u>), and granting a general exclusion order covering those forage

harvesters as well as cease and desist orders against Bourdeau, OK, and other

respondents, <u>Certain Agric. Vehicles & Components Thereof</u>, Inv. No. 337-TA-487 (Int'l

Trade Comm'n Sept. 24, 2004) (<u>ITC Remedy Determination</u>).  We vacate and remand.

I

On January 8, 2003, Intervenor Deere & Co. (Deere) filed a complaint with the

ITC alleging violations of 19 U.S.C. § 1337 (section 1337) by the importation into the

United States, and sale in the United States, of certain used agricultural vehicles that

infringed United States Registered Trademark Nos. 1,503,576, 1,502,103, 1,254,339,

and 91,860 (the Deere trademarks).  In particular, Deere alleged that Deere forage

harvesters that had been manufactured solely for sale in Europe (the European version

forage harvesters) were being imported into the United States.  Deere argued that the

European version forage harvesters were materially different from the forage harvesters

manufactured and authorized for sale in the United States (the North American version

forage harvesters).  Thus, Deere claimed that the European version forage harvesters

constituted "gray market goods" such that they infringed Deere's trademarks.  The ITC

commenced an investigation on February 7, 2003.  On January 13, 2004, the ALJ

issued his Initial Determination in which he found that appellants' importation of used

Deere European version forage harvesters violated section 1337.  The ALJ

recommended that the ITC issue a general exclusion order covering the infringing

Deere forage harvesters and cease and desist orders against Bourdeau, OK, and other

non-appellant respondents.  Appellants filed a Petition for Review on January 23, 2004,

and on March 30, 2004, the ITC issued a notice indicating that it had decided not to review the Initial Determination. On May 14, 2004, after analyzing the proposed remedy and the effect of any remedial orders on the public interest, the ITC followed the ALJ's recommendation and issued both the general exclusion order and the cease and desist orders. Appellants timely filed a notice of appeal. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(6).

II

We review the factual findings of the Commission under the substantial evidence standard. SKF USA, Inc. v. Int'l Trade Comm'n, 423 F.3d 1307, 1312 (Fed. Cir. 2005); see 19 U.S.C. § 1337(c) (2000); 5 U.S.C. § 706(2)(E) (2000). Thus, we will not overturn the ITC's factual findings if they are supported by such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. SKF, 423 F.3d at 1312 (quoting Finnigan Corp. v. Int'l Trade Comm'n, 180 F.3d 1354, 1362 (Fed. Cir. 1999)). However, we review legal conclusions of the ITC de novo. Id. (citing 5 U.S.C. § 706(2)(A) (2000); Checkpoint Sys. v. Int'l Trade Comm'n, 54 F.3d 756, 760 (Fed. Cir. 1995)).

III

Section 1337(a)(1)(c) forbids "[t]he importation into the United States, the sale for importation, or the sale within the United States after importation by the owner, importer, or consignee, of articles that infringe a valid and enforceable United States trademark registered under the Trademark Act of 1946." Thus, section 1337 grants the ITC the power to prevent the importation of goods that, if sold in the United States, would violate one of the provisions of the federal trademark statute, the Lanham Act.

Many of the goods that are forbidden from importation under section 1337 are what are referred to as "gray market goods": products that were "produced by the owner of the United States trademark or with its consent, but not authorized for sale in the United States." Gamut Trading Co. v. Int'l Trade Comm'n, 200 F.3d 775, 777 (Fed. Cir. 1999). The rationale behind preventing importation of these goods is that the public associates a trademark with goods having certain characteristics. Id. at 778-79. To the extent that foreign goods bearing a trademark have different characteristics than those trademarked goods authorized for sale in the United States, the public is likely to become confused or deceived as to which characteristics are properly associated with the trademark, thereby possibly eroding the goodwill of the trademark holder in the United States. Id. at 779

Thus, gray market theory recognizes both the territorial boundaries of trademarks and a trademark owner's right to control the qualities or characteristics associated with a trademark in a certain territorial region. As such, the basic question in gray market cases "is not whether the mark was validly affixed" to the goods, "but whether there are differences between the foreign and domestic product and if so whether the differences are material." Id. We have applied "a low threshold of materiality, requiring no more than showing that consumers would be likely to consider the differences between the foreign and domestic products to be significant when purchasing the product." Id.

However, even though the threshold of materiality is low, "a plaintiff in a gray market trademark infringement case must establish that all or substantially all of its sales are accompanied by the asserted material difference in order to show that its goods are materially different." SKF, 423 F.3d at 1315 (emphasis added). As we noted

in SKF, the sale by a trademark owner of the very same goods that he claims are gray market goods is inconsistent with a claim that consumers will be confused by those alleged gray market goods. Id. "To permit recovery by a trademark owner when less than 'substantially all' of its goods bear the material difference . . . would allow the owner itself to contribute to the confusion by consumers that it accuses gray market importers of creating." Id. That is, a trademark owner has the right to determine the set of characteristics that are associated with his trademark in the United States; however, a trademark owner cannot authorize the sale of trademarked goods with a set of characteristics and at the same time claim that the set of characteristics should not be associated with the trademark.

This case involves the importation and sale of used forage harvesters manufactured by Deere. Deere sells 5000 and 6000 series forage harvesters in both the United States and Europe through a network of authorized dealers and distributors. The 5000 series is manufactured exclusively in the United States, regardless of the market for which it is destined, while the 6000 series is manufactured exclusively in Germany. Both the 5000 and 6000 series forage harvesters fit generally into two categories: the North American version forage harvesters, which are manufactured for sale in the United States and North America, and the European version forage harvesters, which are manufactured for sale in Europe. Although the North American and European version forage harvesters are sold under the same series numbers, they have certain differences, including labeling differences and differences in certain safety features, discussed at greater length below.

Appellants are involved in the importation into the United States and the resale of used European version forage harvesters of both the 5000 and 6000 series. The ITC determined that the European versions of these forage harvesters are materially different from their North American counterparts and that the importation and sale of these forage harvesters violates section 1337.

IV

As a threshold matter, appellants argue that, because the 5000 series forage harvesters are manufactured in the United States, they are not "gray market goods" and thus that importation and sale of these forage harvesters cannot violate section 1337. Appellants point to the Supreme Court's decision K Mart Corp. v. Cartier, Inc., 486 U.S. 281 (1987), in which the Court, while addressing whether certain Customs regulations were consistent with 19 U.S.C. § 1526, discussed the meaning of the term "gray market goods." The Court noted that a gray market good is "a foreign-manufactured good, bearing a valid United States trademark, that is imported without the consent of the United States trademark holder." K Mart, 486 U.S. at 285. Although the Court did not purport to exclusively define the term "gray market goods" in K Mart, it articulated three of the scenarios in which a gray market may exist:

> [T]he prototypical gray market victim (case 1) is a domestic firm that purchases from an independent foreign firm the rights to register and use the latter's trademark as a United States trademark and to sell its foreign-manufactured products here . . . . The second context (case 2) is a situation in which a domestic firm registers the United States trademark for goods that are manufactured abroad by an affiliated manufacturer . . . [and i]n the third context (case 3), the domestic holder of a United States trademark authorizes an independent foreign manufacturer to use it. Usually the holder sells to the foreign manufacturer an exclusive right to use the trademark in a particular foreign location, but conditions the right on the foreign manufacturer's promise not to import its trademarked goods into the United States.

Id. at 286-87 (emphasis in original).  Appellants argue that the Court did not include in these three scenarios a case in which a domestic firm manufactures a product in the United States for sale abroad and that good is re-imported to the United States for later sale without the trademark owner's permission.  Thus, appellants argue that a good manufactured domestically for export cannot be a "gray market good" and hence cannot violate section 1337.

However, K Mart did not address violations of either section 1337 or of the Lanham Act.  Rather, the case discussed gray market theory as the background to an analysis of whether certain Customs regulations were consistent with section 526 of the Tariff Act of 1930, 19 U.S.C. § 1526, which attempted to regulate, for the first time, the importation of "gray market goods."  See K Mart, 486 U.S. at 285-87.  Both the regulation at issue, 19 C.F.R. § 133.21, and 19 U.S.C. § 1526 specifically refer to "[f]oreign-made articles" or "merchandise of foreign manufacture."  Id. at 287-88 (quoting 19 C.F.R. § 133.21 (1987) and 19 U.S.C. § 1526).  Thus, it is not surprising that the Court's description of gray market theory focused on goods of foreign manufacture.  Further, the Court noted that "[t]he regulations implementing § 526 . . . have not applied the prohibition to all gray-market goods."  Id. at 288.  Thus, K Mart should not be read to limit gray market theory, as it is applied in the context of section 1337, to goods of foreign manufacture.

In addition, the ITC has already determined that trademarked goods manufactured in the United States exclusively for sale in foreign countries may violate section 1337 if they are imported into the United States without the trademark owner's permission and if they are materially different from the trademarked goods authorized

for sale in the United States.  See Certain Cigarettes & Packaging, Thereof, Inv. No. 337-TA-424, USITC Pub. 3366, Commission Opinion at 2, n.2 (Int'l Trade Comm'n, Oct. 16, 2000) (Cigarettes) (finding that cigarettes manufactured in the United States but intended for sale exclusively abroad violated section 1337).  Although the ITC expressly declined to refer to the goods in Cigarettes as "gray market goods," using instead the terms "for-export" or "re-imported," the ITC analyzed whether the goods violated section 1337 using the "material difference" standard we applied in Gamut.[1]

Indeed, section 1337(a)(1)(c) makes no reference to the term "gray market."  In addition, unlike the statute at issue in K Mart, it does not distinguish between goods of domestic manufacture and goods of foreign manufacture.  Rather, the statute simply declares unlawful "[t]he importation into the United States, the sale for importation, or the sale within the United States after importation by the owner, importer, or consignee, of articles that infringe a valid and enforceable United States trademark registered under the Trademark Act of 1946."  19 U.S.C. § 1337(a)(1)(c).

Finally, although this court noted in Gamut that "[t]he term 'gray market goods' refers to genuine goods that in this case are of foreign manufacture," we did not expressly limit the term "gray market goods"—nor yet the reach of section 1337—to foreign-manufactured goods.  200 F.3d at 778 (emphasis added).  Rather, we noted

---

[1]    Many district courts have also found that the importation or sale of products manufactured domestically exclusively for export may constitute trademark infringement. See R.J. Reynolds Tobacco Co. v. Premium Tobacco Stores, Inc., 71 USPQ2d 1670, 1673-74 (N.D. Ill. 2004); Am. Home Prods. v. Reliance Trading Co., 55 USPQ2d 1756 (C.D. Cal. 2000); R.J. Reynolds Tobacco Co. v. Premium Tobacco Stores, Inc., 52 USPQ2d 1052, 1054 (N.D. Ill. 1999); Philip Morris, Inc. v. Allen Distribs., Inc., 48 F. Supp. 2d 844, 852 (S.D. Ind. 1999); Philip Morris Inc. v. Cigarettes for Less, 69 F. Supp. 2d 1181, 1184 n.6 (N.D. Cal. 1999), aff'd, 215 F.3d 1333 (9th Cir. 2000).

that "[t]he principle of gray market law is that the importation of a product that was produced by the owner of the United States trademark or with its consent, but not authorized for sale in the United States, may, in appropriate cases infringe the United States trademark." Id. at 777. Thus, gray market law is not concerned with where the good was manufactured, nor is it concerned with whether the trademark owner controlled the manufacture of the product or authorized the use of the trademark on that product in another country. Instead, gray market law is concerned with whether the trademark owner has authorized use of the trademark on that particular product in the United States and thus whether the trademark owner has control over the specific characteristics associated with the trademark in the United States.

As such, we agree with the ITC, and we hold that the importation and sale of a trademarked good of domestic manufacture, produced solely for sale abroad and not authorized by the owner of the trademark for sale in the United States, may violate section 1337 if the imported good is materially different from all or substantially all of those goods bearing the same trademark that are authorized for sale in the United States.

V

In order to find a violation of section 1337, the imported goods must be materially different from all or substantially all of those trademarked goods authorized for sale in the United States. The materiality threshold is low, "requiring no more than showing that consumers would be likely to consider the differences between the foreign and domestic products to be significant when purchasing the product, for such differences would suffice to erode the goodwill of the domestic source." Gamut, 200 F.3d at 779.

Indeed, there need only be one material difference between a domestic and a foreign product in order to determine that the latter is a gray market good eligible for exclusion. See, e.g., id. at 780-82 (affirming ITC finding of material difference based solely on the absence of English-language warning and instructional labels on foreign goods). However, the "plaintiff . . . must establish that all or substantially all of its sales are accompanied by the asserted material difference in order to show that its goods are materially different." SKF, 423 F.3d at 1315.

In this case, the ALJ found that there were numerous differences between the European and North American versions of both the 5000 and 6000 series forage harvesters that a customer in the United States would be likely to consider significant when purchasing the product. Initial Determination, slip op. at 19. While, for the most part, the appellants do not contest the existence of differences between the North American and European version forage harvesters, they argue that substantial evidence does not support the ALJ's findings that these differences are material.[2]

However, substantial evidence supports the ALJ's determination that there are several differences between the North American and European version forage harvesters of both the 5000 and 6000 series that a customer would be likely to consider significant when purchasing the product. Both the 5000 and 6000 series harvesters contain differences in safety features that a customer would be likely to consider significant when purchasing the product. First of all, there are material differences

_____

[2]    Appellants contest only whether there are differences in the warranty services supplied to North American and European version forage harvesters. However, as noted below, it is unnecessary to address differences in warranty services, as other differences suffice to render the North American and European version forage harvesters materially different.

between the lighting configuration and lighting functions of the North American and European forage harvesters, including the type of lights used during transport, the manner in which hazard lights and turn signals function, and whether safety warning lamps exist. There are also material differences between the warning labels and safety decals on the North American forage harvesters, which carry pictures and English writing, and European forage harvesters, which carry only pictures. See In Re Certain Agric. Tractors Under 50 Power Takeoff Horsepower Investigation, 44 USPQ2d 1385, 1402 (Int'l Trade Comm'n 1997) ("Tractors") (finding that the absence of English-language warning and instructional labels on foreign goods constituted a material difference), aff'd, Gamut, 200 F.3d 775.

There are several other material differences between the North American and European versions of both the 5000 and 6000 series forage harvesters. There is a material difference in the hitch mechanism of the North American and European forage harvesters, as the mechanism in the European forage harvesters is not compatible with wagons used in North America. In addition, the operator's manuals of the European version forage harvesters are in the language of the target country, while the American forage harvesters' manuals are in English. Although appellants claim that North American manuals are often provided to purchasers of European version forage harvesters, this only serves to heighten confusion, as the North American and European manuals contain different information due to other differences in the products.

Finally, there are differences in the services provided along with the machines, including the Deere Product Improvement Programs (PIPs) and Service Information System (SIS). Although all three types of Deere's PIPs—mechanical, fix-it fail, and

safety—are free to customers who have purchased American forage harvesters, the owners of European forage harvesters only qualify for safety PIPs. Further, the SIS, which records details about past PIPs, differs depending on the PIPs for which a machine is available, such that more information is available for North American forage harvesters than European forage harvesters.[3]

VI

While the ALJ properly determined that there are material differences between the North American and European forage harvesters, Deere did not establish that all or substantially all of its sales were accompanied by these asserted material differences. That is, Deere did not establish that all or substantially all of its sales in the United States were of North American forage harvesters.

In their briefing to the ALJ and to this court, appellants argued that Deere actually sold European forage harvesters in the United States through its network of authorized dealers. In particular, appellants argued that, as early as 1997 and continuing through July of 2003, certain Deere dealers with authority from Deere sold used European forage harvesters in the United States. Appellants asserted that more than fifty used

---

[3] In addition to the material differences between North American and European version forage harvesters that are present in both the 5000 and 6000 series, there are several differences specific to the 6000 series forage harvesters, including differences in seatbelts, seat switches, backup alarms, cutterhead alarms, hydraulic lockout switches, and the maximum ground travel speed of the machine. In addition, the ALJ found that the warranty services provided by Deere differ for the North American and European version foreign harvesters. However, in Gamut, 200 F.3d at 780-82, we affirmed a finding of trademark infringement based upon a single material difference in the products. Since we have determined that substantial evidence shows several material differences in both lines of forage harvesters, it is unnecessary to address those differences specific to the 6000 series forage harvesters and any differences in warranty coverage.

European forage harvesters were sold to them by authorized Deere dealers in the United States and in Europe, and that authorized Deere dealers purchased more than ten European forage harvesters from them. Appellants additionally argued that Deere was aware of the sales of European forage harvesters in the United States as early as 1999, but took no action to stop these sales by authorized Deere dealers until at least 2002. Indeed, appellants argued that Deere permitted its corporate employees to assist authorized dealers in the importation, purchase, and sale of European forage harvesters in the United States, and that "[i]n some instances Deere corporate representatives assisted authorized Deere dealers prior to the sale of European harvesters to U.S. customers." Pet. Br. at 21.

In support of its argument that Deere authorized the sales of European forage harvesters in the United States, appellants also noted that Deere installed cutterhead rotational alarms, a safety device, on certain European forage harvesters located in the United States. Further, appellants argued that Deere promoted the sale of European forage harvesters in the United States through its website www.machinefinder.com. This website, which is owned and operated by Deere, allows consumers to search for forage harvesters through the worldwide network of authorized Deere dealers, providing information about individual machines and contact information for their sellers, such that United States consumers can search for European forage harvesters offered for sale by authorized Deere dealers in Europe. Thus, appellants argue that Deere, through its authorized dealers, imported and sold European forage harvesters in the United States.

If appellants are correct that Deere authorized such United States sales of European forage harvesters, and if such sales were sufficient in number to show that

not all or substantially all of Deere's United States sales were not materially different, Deere would not be entitled to section 1337 relief. Indeed, the ALJ recognized this point, stating during the hearing that "[i]f John Deere authorizes the importation of [European forage harvesters], then the Staff agree there are no material differences."[4] Transcript of Hearing at 2365, Certain Agric. Vehicles & Components Thereof, Inv. No. 337-TA-487 (Sept. 30, 2003).

Deere responded by arguing that the sales of European forage harvesters in the United States were by a small number of dealers who did not have authority to engage in such sales. Deere claimed that once it learned that these dealers were engaged in the importation and sale of European forage harvesters, it ordered them to cease doing so and threatened to include these dealers as respondents in the instant case. Further, Deere claimed that it informed its dealers that it would no longer provide warranty services for illegally imported European forage harvesters.

Appellants made their assertions regarding the sale of European forage harvesters by authorized Deere dealers in two different contexts. First, appellants asserted affirmative defenses to Deere's claims. Appellants argued that Deere was

---

[4] We assume that the ALJ's understanding with regard to this point was premised on the Fifth Circuit's opinion in Martin's Herend Imports, Inc. v. Diamond & Gem Trading U.S.A. Co., 112 F.3d 1296, 1304 (5th Cir. 1997), in which the court held that "the sale of even one authorized porcelain piece would have resulted in the denial of relief with respect to all porcelain pieces of 'the same quality from the same product line.'" SKF, 423 F.3d at 1316 (quoting Martin's Herend, 112 F.3d at 1304). However, at the time of the hearing, we had not yet issued our decision in SKF, wherein we refined the rule of Martin's Herend, holding that "[a] single sale of a nonconforming item typically should not defeat a trademark owner's protection," but that "a trademark owner must show that all or substantially all of its authorized goods are accompanied by each of the claimed material differences to satisfy that standard." Id. Thus, the ALJ did not have the benefit of SKF when issuing his Initial Determination.

estopped from asserting its trademark infringement claims because authorized Deere dealers had apparent authority to sell European forage harvesters, Bourdeau's Post-Hearing Reply Br. at 34, and that Deere's claims were barred by its "unclean hands" as it had permitted its authorized dealers to sell European forage harvesters in the United States, id. at 41. However, appellants also argued that Deere had failed to establish its prima facie case, i.e., the existence of a material difference between the accused products and products authorized for sale in the United States, because "Deere, through its authorized distribution network, has imported, exported, purchased and sold the exact same European harvesters which form the basis of its claims against [appellants]." Bourdeau's Post-Hearing Br. at 13 (emphasis in original). That is, appellants argued that Deere had not established that "all or substantially all of its sales [we]re accompanied by the asserted material difference." SKF, 423 F.3d at 1315.

Although the ALJ did not err in rejecting these particular defenses, he never considered these arguments as part of Deere's prima facie case. Relying primarily on the testimony of Deere's corporate witness, Mr. Meister, the ALJ found that appellants had failed to bear their burden of proving the affirmative defenses of estoppel and unclean hands. The ALJ noted in particular that appellants "have not established that Deere somehow fraudulently or deceptively used the marks in issue to facilitate the importation of European version [forage harvesters] into the United States" and that the appellants "did not establish the apparent authority of Deere's dealers to authorize gray market imports." Initial Determination, slip op. at 147. The ALJ did not find that Deere had established that the sales of European forage harvesters by Deere dealers were not authorized, such that all of Deere's sales were of North American forage harvesters,

or that, even if the sales of the European forage harvesters were authorized, the number of European forage harvesters sold was so small that substantially all of Deere's sales were of North American forage harvesters. Indeed, Deere, in attempting to distinguish SKF from the instant case, argues that "Appellants have failed to quantify Deere's overall sales and the relative ration or alleged non-conforming sales, much less established a ratio of non-conforming sale approaching [that of SKF]." Deere's Letter of Nov. 17, 2005 at 2. However, SKF clearly places the burden on Deere to establish that all or substantially all of the sales were materially different from the alleged gray market goods. Thus, we must remand this case to the ITC for a determination of whether Deere bore its burden under SKF.

Indeed, because SKF places the burden on Deere of establishing that all or substantially all of the authorized sales in the United States were of North American forage harvesters, the ITC must presume that sales by authorized dealers were in fact authorized by Deere. To hold otherwise would enable a plaintiff to simply disclaim the sales of any products that do not contain the alleged material differences; Deere could disclaim the sales of any European forage harvesters by simply asserting that such sales were not authorized. On remand, Deere may rebut the presumption that all sales by its authorized dealers were authorized. However, Deere bears the burden of proving that sales of European forage harvesters by its authorized dealers were not authorized sales.

Nonetheless, even if Deere cannot establish on remand that the sales of European forage harvesters by authorized Deere dealers were not authorized, it may still prevail if it can establish that the number of sales of European forage harvesters

04-1588                                16

was so small that substantially all of Deere's sales in the United States were of North American forage harvesters, such that substantially all of the authorized sales were of goods bearing the asserted material differences. As the burden of proof to establish trademark infringement is preponderance of the evidence, see, e.g., KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc., 543 U.S. 111, 120 (2004), we hold that Deere must meet its burdens by a preponderance of the evidence.

## VII

Finally, the appellants argue that the ITC erred in granting a general exclusion order that did not contain an exception for goods bearing a permanent nonremovable label indicating their origin. However, because we vacate the ITC decision affirming the ALJ's Initial Determination, we do not reach appellants' challenge to the remedy. For the reasons stated above, we vacate and remand.

## COSTS

No costs.

## VACATE AND REMAND